1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   MARK VINCENT HALL, BBK134,              )
                                             )   No. C 12-2340 CRB (PR)
12              Plaintiff,                    )
                                             )   ORDER GRANTING
13        v.                                  )   DEFENDANTS' MOTION
                                             )   FOR SUMMARY
14   HAYWARD POLICE DEP'T, et al.,            )   JUDGMENT
                                             )
15              Defendant(s).                 )   (Docket # 21)
                                             )

16

17        Plaintiff Mark Vincent Hall, a prisoner at the Santa Rita County Jail

18   (SRCJ), filed a first amended complaint for damages under 42 U.S.C. § 1983

19   alleging that Hayward police officers M. Troche, M. Miller, J. Faria and C.

20   Norris used excessive force in the course of his arrest.  The Court found the claim

21   cognizable and dismissed all other claims from this action.  July 26, 2012 Order

22   (dkt. #7) at 2-3.

23        Defendants now move for summary judgment on the ground that their

24   actions do not rise to the level of a constitutional violation.  Mot. for Summ. J.

25   (dkt. #21) at 2. They also contend that they are entitled to qualified immunity.  Id.

26   at 12-14.  Hall filed an untimely opposition, (dkt. #24), and defendants filed a

27   reply, (dkt. #27).

28        /

1

**BACKGROUND**[1]

2       On July 31, 2011, defendant officers responded to three 911 calls

3   reporting domestic abuse in progress at 987 Forselles Avenue in Hayward.

4   Troche Decl. ¶ 2, Ex. 1; Norris Decl. ¶ 2, Ex. 1; Miller Decl. ¶ 2, Ex. 1; Faria

5   Decl. ¶ 2, Ex. 1.  Dispatch advised the officers that the calls reported a male

6   hitting a female and dragging her back inside an apartment; the female victim

7   was pleading for her assailant to stop and for someone to help her.  Id.

8   According to Hall, he argued with his girlfriend Shereese and slapped her three

9   times; he then "help[ed] her up off the ground" because she was sliding in her

10  house slippers and then "[they] walked back into the apartment and closed the

11  door."  Compl. Attach. 1.

12      The apartment had a solid front door and a security screen door, both of

13  which were closed.  Troche Decl. ¶ 4, Exs. 2-3; Norris Decl. ¶ 4; Miller Decl. ¶ 4;

14  Faria Decl. ¶ 4.  There were no windows on either side of the front door.  Id.  The

15  officers heard the following statements coming from inside the apartment when

16  they arrived at the scene: "You ain't gonna leave me!"; "I'm sorry"; and "I'm

17  going to fuck you up."  The female was crying.  Troche Decl. ¶¶ 4-5; Norris

18  Decl. ¶¶ 4-5; Miller Decl. ¶¶ 5-7; Faria Decl. ¶ 4.  Officers opened the unlocked

19  screen door and knocked on the front door several times while announcing their

20  presence and demanding that the door be opened.  Id.  During the knocking, the

21  officers heard someone from inside say, "Bitch, I'm gonna fuck you up!"  Id.

22  Officer Troche also heard what he believed to be the sound of flesh hitting flesh.

23  Troche Decl. ¶ 5.  These sounds, the statements, the 911 calls, and the failure of

24  the residents to open the door led the officers to believe that a battery was in

25  progress.  Based on the exigent circumstances and the failure of the occupants to

26

27       [1]The following facts are undisputed unless otherwise indicated.

28

open the door, Officer Troche kicked open the door.

According to Hall, he immediately opened the door in answer to the knocking, but then Officer Troche looked directly at him and kicked the door into his face. Compl. Attach. 1. Hall claims that the force shoved him into the victim, causing him to headbutt her and her falling to the marble floor; he then fell on top of her with all of his weight. Id. However, in his interview with the police after the incident, Hall admitted several times that the door was kicked in before he was able to open it; he made no assertion that the officers were aware that he was about to comply. Edwards Decl., Ex. 3 at 3:14, 4:13, 4:27, 4:39.

Hall was found in a kneeling position on the ground just left of the front door. Troche Decl. ¶ 6. At the time, Hall was 5'11" and 250 lbs., and his face was covered in blood. Id. Unknown to the officers at the time, the door struck Hall in the head when it was kicked open as he was attacking the victim from right behind the door. Troche Decl. ¶¶ 4, 8. Hall was straddling the victim's legs as if he was about to strike her in the head. Troche Decl. ¶¶ 6-12; Norris Decl. ¶ 13. The victim was covered in blood, her shirt was ripped, and she was naked from the waist down. Troche Decl. ¶¶ 6, 18; Miller Decl. ¶ 9. According to Hall, the victim had pulled down her pajama bottoms to look at the bruises on her right leg. Compl. Attach. 2. There were knives and a pair of kitchen scissors within Hall's reach. Troche Decl. ¶¶ 7, 12, 20; Miller Decl. ¶¶ 8, 11; Norris Decl. ¶ 8; Faria Decl. ¶ 9. Officer Troche pulled Hall off the victim and onto the ground, landing him on the threshold of the doorway where Officers Troche and Miller handcuffed him. Troche Decl. ¶¶ 8-12; Miller Decl. ¶¶ 8-12; Norris Decl. ¶¶ 6-8; Faria Decl. ¶¶ 6-9. Officers had not yet made a full entry into the apartment. According to Hall, Officers Troche and Norris came into the apartment and "grabbed" him, after which Officer Norris put Hall's left wrist into an "elongated

1    wrist lock" and then handcuffed him.  Compl. Attach. 2.

2        Due to Hall's position in the threshold of the doorway, he was preventing

3    access to the victim.  The victim was vomiting large amounts of blood and

4    required immediate medical aid.  Additionally, officers could not effectively

5    search Hall due to the narrow nature of the entry way, nor could they conduct a

6    protective sweep because of Hall's presence in the doorway.  These factors, the

7    close proximity of the knives, and the officers' training in the "fatal funnel,"

8    required them to move Hall out of the doorway quickly.  Troche Decl. ¶¶ 8-12;

9    Miller Decl. ¶¶ 8-12; Norris Decl. ¶¶ 6-9; Faria Decl. ¶¶ 6-9.

10       Hall was pulled a body length, just outside the door.  Because Hall was

11   handcuffed, he was unable to get to his feet unassisted.  According to defendants,

12   the process of pulling Hall off the victim, handcuffing him, and pulling him out

13   of the doorway was a fluid process which took approximately fifteen (15)

14   seconds.  Id.  According to the Computer Aided Dispatch ("CAD") logs, it was

15   less than three minutes from the time the last of the four officers appeared on the

16   scene until the protective sweep was performed, which included time to remove

17   Hall from the apartment.  Troche Decl. ¶ 2, Ex. 1.

18       During the protective sweep, Officer Faria was left alone with Hall.  Hall

19   was placed in "figure 4 leg control hold" to prevent him from moving and to

20   ensure that Officer Faria could control Hall.  Once the sweep was conducted,

21   Officers Miller and Faria helped Hall to his feet and put him into the patrol car.

22   Faria Decl. ¶¶ 10-11.

23       According to Hall, Officers Faria and Miller joined Officers Troche and

24   Norris when he was taken outdoors.  All four officers picked Hall up from his

25   right side, "off of [his] feet and slammed [him] onto the ground, head first,

26   striking [his] face."  The officers then dragged Hall on the ground, while he was

27

28                                      4

1    screaming because the skin on his left side from his face, arm and hand was

2    scraped.  Hall claims that he was dragged through the driveway in front of two

3    apartments along Forselles Way.  Hall also claims that Officers Miller and Faria

4    picked him up and slammed his head on to the trunk of the neighbor's car, and

5    then dragged him along the passenger side windows and doors.  They also

6    slammed Hall head first onto the driver's side hood of another car.  Compl.

7    Attach. 2.  Defendants deny that they used any force on Hall beyond pulling him

8    off of the victim, handcuffing him, and constraining him until the protective

9    sweep was completed.

10    Hall claims that he sustained migraine headaches "to this day from being

11    hit with the door and also from being slammed, head first."  He continues to

12    experience ringing in his ears, "blurred vision, blocked nasal passages from

13    injury to [his] nose, pain in [his] wrist which pops unexpectantly [*sic*] and the

14    hardening of [his] tongue" due to the "brutality" by the officers.  Id.

15    Hall was taken to the hospital where he was given tramadol for headache

16    and pain.  Id.  The victim was also rushed to the hospital where she was found to

17    have severe injuries to her face and body.  Her face was severely swollen and

18    there was minor bleeding in the posterior part of her brain.  Due to the severity of

19    the victim's injuries, Hall is currently awaiting trial on charges of attempted

20    murder, domestic violence, false imprisonment, and assault with a deadly weapon

21    (knife).

**DISCUSSION**

23    **A.    Standard of Review**

24    Summary judgment is proper where the pleadings, discovery and

25    affidavits demonstrate that there is "[n]o genuine dispute as to any material fact

26    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

27

28

1  Material facts are those which may affect the outcome of the case. Anderson v.

2  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of material fact is

3  genuine if there is sufficient evidence for a reasonable jury to return a verdict for

4  the nonmoving party. Id.

5       The party moving for summary judgment bears the initial burden of

6  identifying those portions of the pleadings, discovery, and affidavits which

7  demonstrate the absence of a genuine dispute of material fact. Celotex Corp. v.

8  Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden

9  of proof on an issue at trial, it must affirmatively demonstrate that no reasonable

10 trier of fact could find for the nonmoving party. But on an issue for which the

11 nonmoving party will have the burden of proof at trial, as here, the moving party

12 need only point out "[t]hat there is an absence of evidence to support the

13 nonmoving party's case." Id.

14      Once the moving party meets its initial burden, the nonmoving party must

15 go beyond the pleadings to demonstrate the existence of a genuine dispute of

16 material fact by "[c]iting to specific parts of materials in the record" or

17 "[s]howing that the materials cited do not establish the absence or presence of a

18 genuine dispute." Fed. R. Civ. P. 56(c). A triable dispute of material fact exists

19 only if there is sufficient evidence favoring the nonmoving party to allow a jury

20 to return a verdict for that party. Anderson, 477 U.S. at 249. If the nonmoving

21 party fails to make this showing, "[t]he moving party is entitled to judgment as a

22 matter of law." Celotex, 477 U.S. at 323.

23 **B.**    **Claims and Analysis**

24      Excessive force claims which arise in the context of an arrest or

25 investigatory stop of a free citizen are analyzed under the Fourth Amendment

26 reasonableness standard. See Graham v. Connor, 490 U.S. 386, 394-95 (1989);

27

28  6

1  Forrester v. City of San Diego, 25 F.3d 804, 806 (9th Cir. 1994), cert. denied,

2  513 U.S. 1152 (1995). "To determine whether officers used excessive force

3  during an arrest, courts balance 'the nature and quality of the intrusion on the

4  individual's Fourth Amendment interests against the countervailing governmental

5  interests at stake.'" Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010)

6  (quoting Graham, 490 U.S. at 396). Relevant factors for consideration in this

7  case-by-case inquiry include "'the severity of the of the crime at issue, whether

8  the suspect poses an immediate threat to the safety of the officers or others, and

9  whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id

10  at 980 (quoting Graham, 490 U.S. at 396). These factors are not exclusive.

11  Glenn v. Washington County, 673 F.3d 864, 872 (9th Cir. 2011). The "most

12  important" factor is whether the individual posed an immediate threat to the

13  safety of officers or others. Id. Courts also consider, under the totality of the

14  circumstances, the "quantum of force used to arrest the plaintiff, [citation], the

15  availability of alternative methods of capturing or detaining the suspect,

16  [citation], and the plaintiff's mental and emotional state [citation]." Luchtel, 623

17  F.3d at 980.

18      The reasonableness inquiry in excessive force cases is an objective one,

19  the question being whether the officers' actions are objectively reasonable in

20  light of the facts and circumstances confronting them, without regard to their

21  underlying intent or motivation, and without the "20/20 vision of hindsight."

22  Graham, 490 U.S. at 396-97; Luchtel, 623 F.3d at 980. Police officers are not

23  required to use the least intrusive degree of force possible; they are required only

24  to act within a reasonable range of conduct. See Forrester, 25 F.3d at 806-07 (use

25  of minimal and controlled force in manner designed to limit injuries reasonable);

26  see also Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) (requiring officers to

27

28                                         7

1   find and choose least intrusive alternative would require them to exercise

2   superhuman judgment), cert. denied, 515 U.S. 1159 (1995).

3          Defendants argue that the force used was justified and reasonable

4   considering the relevant factors, i.e., severity of the crime, immediacy of threat to

5   the safety of officers and others, resistance to arrest, the quantum of force used,

6   and their efforts to temper the use of force, and that their actions were

7   objectionably reasonable under the totality of circumstances . Mot. for Summ. J.

8   at 6, 12.

9          With respect to the first factor, defendants were aware that at a minimum

10   they were confronting an ongoing battery.  They were advised by dispatch that

11   several 911 calls reported a male hitting a female and dragging her back into the

12   apartment.  The calls also reported that the woman was screaming for help.  Hall

13   admitted that he struck the victim three times outside the apartment.  At the

14   scene, defendants heard statements and sounds consistent with an ongoing battery

15   taking place within the apartment, including that sound of flesh striking flesh.

16   Once the door was breached, the defendants saw Hall on top of the victim who

17   was covered in blood and her face swollen.  She was also naked from the waste

18   down which indicated that she may have been raped.

19          Secondly, the immediacy of the threat to defendants and the victim – the

20   "most important factor" – was extremely high.  Glenn v. Washington County,

21   673 F.3d at 872.  The 911 calls indicated that the victim was being beaten and

22   that she feared for her safety.  Once they arrived at the scene, officers heard

23   someone inside the apartment say, "Bitch, I'm gonna fuck you up!" and the

24   sound of flesh hitting flesh.  Furthermore, the occupants were unresponsive to the

25   defendants' knocks and demands for the door to be opened.  It was reasonable for

26   the defendants to believe that the battery was ongoing and escalating.  Finally,

27

28                                         8

1    once the defendants managed to open the door, they saw Hall bending over the

2    bloody victim in a position where he could continue his assault and that there

3    were several knives within his reach. Their observations made it imperative to

4    get Hall off the victim and away from the weapons as quickly as possible.

5         It also appeared that Hall was resisting arrest. As mentioned above, Hall

6    was unresponsive to the defendants' knocks and instructions to open the door.

7    Hall claims that he opened the door and that defendant Troche then kicked it into

8    his face. However, this claim is contradicted by Hall's own statements to the

9    police that the officers kicked open the door before he was able to open it

10   himself. See supra at 3. The police report and the declarations of all four officers

11   corroborate this fact.

12        Defendants also argue that the amount of force they used was de minimus

13   in light of the deadly force used on the victim by Hall at the time of his arrest.

14   The use of deadly force is reasonable only if the police officer has probable cause

15   to believe that the suspect poses a significant threat of death or serious physical

16   injury to the officer or others. See Tennessee v. Garner, 471 U.S. 1, 3 (1985).

17   "Non-lethal, however, is not synonymous with non-excessive; all force – lethal

18   and non-lethal – must be justified by the need for the specific level of force

19   employed." Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2010). See, e.g.,

20   Marquez, 693 F.3d 1167, 1177 (9th Cir. 2012) (officers reasonably can take into

21   account that the volatility of domestic violence situations makes them particularly

22   dangerous). Here, the victim was being severely beaten by Hall, and possibly

23   raped and stabbed. It was also possible that Hall would turn on the officers and

24   use deadly force on them. However, the force used against Hall consisted merely

25   of pulling him off the victim, handcuffing him, and pulling him out of the

26   doorway which is far less than deadly force. Furthermore, defendants used the

27

28                                    9

1    least amount of force necessary to neutralize Hall; although defendant Miller had

2    a taser drawn and pointed at Hall, he never used it.  With respect to Hall's

3    allegation that the officers dragged him along the pavement and then slammed

4    him into two cars, there is simply no evidence to support this claim.  During his

5    extensive interview with the police, which was full of inconsistent statements,

6    Hall failed to mention that he was slammed into any cars.

7            Hall filed an opposition which defendants argue is untimely because it was

8    filed over a month after the due date.  Reply at 4.  Nevertheless, Hall's opposition

9    fails to address the reasonableness of defendants' actions under the factors

10   discussed above.  He asserts that defendants and witnesses are lying, but provides

11   no evidence to support his blanket assertions.  In light of the facts and

12   circumstances before them, the defendants' actions were objectively reasonable.

13   Graham, 490 U.S. at 396-97; Luchtel, 623 F.3d at 980.  Considering the severity

14   of Hall's attack on the victim, the immediacy of the threat to the defendants and

15   the victim, Hall's resistance to arrest, and the quantum of force used, defendants

16   acted within a reasonable range of conduct.  See Forrester, 25 F.3d at 806-07.

17   Because Hall has failed to show that there is genuine dispute of material fact,

18   defendants are entitled to judgment as a matter of law.  Celotex, 477 U.S. at 323.

19   **C      Qualified Immunity**

20           Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a

21   two-step analysis when a defendant asserts qualified immunity in a motion for

22   summary judgment.  The court first faces "this threshold question:  Taken in the

23   light most favorable to the party asserting the injury, do the facts alleged show

24   the officer's conduct violated a constitutional right?"  533 U.S. at 201.  If the

25   court determines that the conduct did not violate a constitutional right, the inquiry

26   is over and the officer is entitled to qualified immunity.

27

28                                              10

1    If the court determines that the conduct did violate a constitutional right, it

2    then moves to the second step and asks "whether the right was clearly

3    established" such that "it would be clear to a reasonable officer that his conduct

4    was unlawful in the situation he confronted." Id. at 201-02. Even if the violated

5    right was clearly established, qualified immunity shields an officer from suit

6    when he makes a decision that, even if constitutionally deficient, reasonably

7    misapprehends the law governing the circumstances he confronted. Brosseau v.

8    Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06. If "the officer's

9    mistake as to what the law requires is reasonable . . . the officer is entitled to the

10    immunity defense." Id. at 205.

11    Defendants are entitled to summary judgment on qualified immunity

12    grounds. Even if the Court assumes arguendo that the defendants' conduct was

13    unconstitutional under the first prong, it cannot be said that reasonable officers in

14    defendants' position would have believed that they were acting unlawfully during

15    the course of arresting Hall. See Saucier, 533 U.S. at 201-02. Or, put differently,

16    it would not have been clear to reasonable officers in defendants' position that

17    kicking the door open, pulling Hall off a bloody victim whom he had been

18    severely beating, handcuffing him and restraining him would amount to excessive

19    force. See id.

20    The undisputed facts show that defendants responded to several 911 calls

21    of domestic violence, and that when they arrived at the scene, the battery was

22    ongoing and escalating from within the apartment. The door was locked and the

23    occupants were unresponsive to defendants' knocks and demands to open the

24    door. When the door was finally breached, Hall was on top of the bloody victim

25    and there were knives within his reach. No reasonable juror could find that

26    defendants were objectively unreasonable in their conduct. Defendants are

27

28    11

1   entitled to qualified immunity.  See Brosseau, 543 U.S. at 198.

2

3                                        **CONCLUSION**

4               For the foregoing reasons, defendants Miller, Troche, Faria and Norris'

5   motion for summary judgment (docket # 21) is GRANTED.  The remaining

6   defendants are DISMISSED from this action as the claims against them were

7   dismissed in the court's Order of Service.

8               The clerk shall enter judgment in favor of defendants and close the file.

9   SO ORDERED.

10  DATED: September 23, 2013

                                                    _____
11                                                  CHARLES R. BREYER
                                                    United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          12